## MOSS VS. SANDEFUR, EX.

It was the intention of the Legislature (*secs.* 46, 47, 48, *ch.* 4, *Dig.*) to invest the Pro-
bate Court with jurisdiction to compel a discovery on oath, &c., where persons were
intrusted, in the lifetime of the deceased, with custody of his effects, or at or about
the time of his death, or soon afterwards, they come into their possession either cas-
ually or by design, and they continue to hold the same quietly and secretly, without
color of lawful authority; but not to invest the Probate Court with jurisdiction of con-
tested rights, and matters of litigation, as to the title to property, between the executor
or administrator and others.

PIKE & CUMMINS, for the appellant. The civil rights of a slave
were merged in the master. Any donation or conveyance of
property to a slave, which the master chooses to accept, vests
alone in the owner. 1 *Bla. Com.* 424; 1 *Domat's Civil Law, p.*
143, *art.* 1. *sec.* 97; 4 *Dessau.* 266, 267. Property found by a
negro, vests in the owner. 1 *Stewart Rep.* 320; 9 *Ala.* 271; 2
*Pick.* 424.

The Probate Court had no jurisdiction. In any event, the

claim was an ordinary one for money had and received, and not a proceeding for specific property. *Art.* 6, *sec.* 10, *Const.; ch.* 48, *sec.* 5, *Rev. Stat.*

CURRAN & GALLAGHER, contra. There can be no question but what the Probate Court had jurisdiction. That the statute is constitutional, see *Welch vs. Lloyd,* 5 *Ark. Rep.* 369. The petition and affidavit bring the case within the statute. (*Dig., ch.* 4, *sec.* 46,) and case cited.

Mr. Justice SCOTT delivered the opinion of the Court.

This cause was brought here by appeal, from a judgment of the Circuit Court of Hempstead county, affirming a judgment of the Probate Court, in the matter of a summary proceeding against the appellant, at the suit of the appellee, as the executor of James H. Dunn, deceased, under the provisions of the statute authorizing the Probate Court, in certain cases, upon complaint of embezzlement or concealment, to cause the party implicated to come before the court and discover on oath, and be further dealt with, if convicted. *Dig., ch.* 4, *sec.* 46, 47, 48.

In the petition, which is verified in the manner prescribed by the statute, it is alleged that the petitioner " has been informed, and believes correctly, that James Moss has in possession, and has concealed money, belonging to the estate of the said James H. Dunn, deceased. Your petitioner, therefore prays, " &c. Process of summons issued, commanding Moss to appear, and answer " a charge of concealing certain money, belonging to the estate," &c. The executor filed a number of interrogatories in writing, some of which were very general, to which he desired the answer of Moss. Moss appeared in obedience to the summons and filed his answer in writing, in response to these interrogatories the substance of which is as follows, to wit: That theretofore, there had been born of a certain negro woman slave, named Mourning, who was owned by, and is the property of, the heirs at law and distributees of James Moss, deceased, a female child,

named Eliza.. That he had been informed, and believed it to be
true, that James H. Dunn, in his lifetime, at divers times, and to
divers persons, had admitted he was the father of Eliza, and
recognized her as his child, and that he had made application to
the heirs of James Moss, deceased, or to some of them, to pur-
chase said child Eliza, that he might manumit her. That he had
been informed, and believed it to be true, that said Dunn, in his
lifetime, and some time before he made and published his last
will and testament, "had given, delivered, and placed in the
hands of said slave, Mourning," the sum of three hundred dol-
lars, to be applied to the purchase and manumission of said child
Eliza. That, several months before the death of Dunn, two
months at least, —the said slave Mourning, at that time hired to
and in the employment of said Dunn, brought to the respondent
a sum of money in coin, which she said was three hundred dol-
lars, and offered to leave the same in pledge with the respondent,
as an indemnity against the death of said child, Eliza, which re-
spondent had refused to permit said Dunn to take with her mother
to Fulton, because, of the then unhealthiness of that place, and the
jeopardy of the life of said child from that source. That, at the
time of the death of Dunn, the slave Mourning was not hired to
him ( Dunn,) nor living with him ; but was in the service of re-
spondent. That Dunn died at Fulton, and respondent's residence
at that time was some twenty miles from that place. That re-
spondent went to Fulton, some five or six days, or a week after
the death of Dunn, which was his first visit there after that
event, and that was the first time, after that event, he had seen
said slave Mourning ; and said slave, at that time, placed into the
hands of the respondent the sum of two hundred and eighty-two
dollars, for safe-keeping. That this sum "is all the money that
said slave ever gave to the respondent, for safe-keeping, " "and
that he now has and holds the same, for the use and benefit of
him, her, or them, to whom it may pertain. "

He denies that said slave Mourning took said sum, or any
other sum, either from the store of the said Dunn, or from about

his person, either about the time of his death, or at any other time, without his ( the said Dunn's) knowledge and consent. He denies that he, the respondent, " on the day of said Dunn's death, or at any other time, ever received any sum of money whatsoever, as he knows or believes, which belonged to, or was owned by Dunn, at the time of his death."   " All of which said responses, allegations, and facts, in response to said general enquiries, this respondent avers and verily believes he can prove and establish, if permitted by the court, by competent and credible witnesses, except the offer of the said $300, as an indemnity for the life of said child Eliza."

Having thus responded to the interrogatories, he makes answer to the allegations contained in the petition, in the following terms, to wit: "That it is not true, that he has in his possession, nor has he, this respondent, concealed any money which belonged, or belongs to the estate of the said James H. Dunn; nor is it true, that the said John B. has been or is correctly informed in regard to the same, as he, in his said petition, has alleged; but it is true, and so this respondent avers the truth to be, that, at divers times, this respondent has conversed with the said John B., in regard to the said sum of money, so by this respondent received from the said slave Mourning, as above stated, and always informed the said John B., of the material facts in regard to the same, and never denied to him, or any one else, the fact that he had received from the said Mourning, the sum by him received as herein above stated and admitted."

He then denies the jurisdiction of the court in the premises, and insists that the remedy, if any, is in the Circuit Court; but submits that if the court retains jurisdiction, the law deducible from the facts is on the side of the respondent.

The entire response is verified by affidavit.   Upon an inspection of the petition, interrogatories, and answers, as is stated in the record, that court was " of opinion that said sum properly belongs to the estate of the said James B. Dunn, deceased, and the record proceeds to state, "It is therefore considered, ordered,

and adjudged, that the said Johh B. Sandefur, as executor of the will of the said James H. Dunn, decased, have and recover of and from the said James Moss, the aforesaid sum of two hundred and eighty-two dollars, so admitted by him as aforesaid, and that the said Moss deliver the same up to the said John B. Sandefur, as such executor."

The appellant took a bill of exceptions, showing that the court overruled his objection to the jurisdiction in the premises, and upon the merits found and adjudged for the appellee.

It will be observed, that the appellant set up no claim to the money in question, either in his own right or in that of the heirs at law or distributees of James Moss, deceased; but averred that he had and held the same for the use and benefit of whomsoever it might rightfully belong to; and as the Probate Court adjudged no costs against him, it may be inferred that he was in that court regarded as presenting himself in the attitude of a stake-holder. Whether or not he was the legal representative of the estate of James Moss, deceased, or was one of the heirs at law, or distributees of that estate, does not appear. But, as the judgment of the Probate Court in this proceeding, where neither the legal representatives, nor the heirs at law, or distributees of James Moss, deceased, were parties, could not exonerate the appellant from a suit for the money in that behalf, wherein it would have to be determined what right these parties had to the money in question, upon the foundation of the ownership of the slave in question, the appellant would have sufficient interest in the controversy to authorize him to question the correctness of the proceedings and judgment.

The first and most important duty of an executor, or administrator, after his induction into office, is to collect, and take into his possession, and make and return an inventory of, the personal goods and chattels, moneys, books, and papers; and other evidences of debts belonging to the estate of his testator or intestate. And it was in aid of this duty, that the jurisdiction in question, un-

der which these proceedings were had, was invested in the Pro-
bate Courts.

This view of the provisions of the statute in question, was ta-
ken by the court in the case of *Welch vs. Lloyd*, (5 *Ark. R.* 370;)
and is supported as well by the language used as by the context.
In the original enactment, the sections of the statute cited above,
as those under which these proceedings were had, and which
passed under the notice of the court in the case cited, were num-
bered 47, 48, 49, and 50, in a consecutive series numbered from 42
to 56, inclusive, all exclusively upon the subject, and making nu-
merous provisions for the collection, inventory, appraisement, and
return of decedents' effects.

To aid in the performance of these important duties, the par-
ticular provisions in question invest the Probate Courts with
authority to compel the attendance of persons charged, in the
manner prescribed, either with concealing or embezzling any
such effects, force them to make discovery on oath, and, if found
unlawfully detaining any such effects, order their delivery to the
executor or administrator entitled to receive them, and enforce
obedience to the order by attachment.

The investment of such authority in these courts, was pecu-
liarly appropriate in view of their functions in our Probate sys-
tem, and doubtless the practical effects of its exercise have
been altogether salutary, in all those cases, not of unfrequent oc-
curence where persons, who have been intrusted, in the lifetime
of the deceased, with custody of his effects, or who, at or about
the time of his death, or soon afterwards, coming into their pos-
session, either casually or by design, hold quietly and secretly,
without color of lawful authority, and evading any discovery of
the truth in the premises, either by direct means or studied silence;
all with fraudulent views, stimulated by the difficulty or impos-
sibility of proof, on the part of the executor or administrator,
either of ownership or identity.

In cases where the executor or administrator may have had no
knowledge of the affairs of the deceased, in his lifetime, he might,

by such means, be seriously obstructed in the performance of these important duties, and in proportion to his want of such knowledge, be hindered and baffled, and precisely in this ratio would the chances of escape from detection be increased, and such fraudulent designs stimulated. To meet such emergencies, the remedy adopted of forcing the moral offender who would rob the dead, to merge his moral into the criminal offence of outright perjury, or let go his unrighteous hold, cannot be without efficacy. Under its operation, the man of conscience, who may have quieted its voice, will hear it speak again in spite of him, when he approaches this open crime; and the hardened offender will at least calculate his chances of escape from the pains and penalties of perjury. When the authority in question is made to extend to the large class of cases, to which we have alluded, and the class must needs be large and infinitely various, because, fraud itself is "infinite," as remarked by Lord HARDWICK, in his letter to Lord KAIMES, manifesting itself as well in the suppression of the truth, as in the suggestion of a falsehood, it was a matter of sufficient importance, in point of mischief, to have attracted the attention of the Legislature, without supposing any regard whatsoever was had to the very questionable policy of turning into Probate Courts, from their accustomed channel, a great stream of litigation touching contested rights to personal chattels, which these courts from their constitution are so little calculated to sustain. Nothing short of a much more distinct and emphatic expression of the legislative will, to that effect, could authorize such a conclusion.

In our opinion, it is clear enough, from the obvious mischief, and the expressed remedy, when viewed in connection with the subject matter, and reasonable scope of the provisions made, that such was not the intention of the Legislature, but that it was to confine this jurisdiction to the class of cases above, which we have designated; or, at most, if it is to extend beyond to any case where the discovery required shows lawful color of adverse claim, either of possession or property, whether in the party ma-

king the discovery, or in a third person, it would be of that class of adverse claims which the Probate Court could properly authorize the executor or administrator to extinguish, for the benefit of the estate; such, for instance, as prior vested liens, like the inn-keeper's.

In the case before us, the discovery that was required, shows the money in question to be in such an equivocal attitude; as to be reasonably a subject of litigation between the executor, or administrator or distributees of James Moss, deceased, predicated upon the ownership of the slave, who deposited it, for safe keeping, in the hands of the respondent, and the executor of Dunn, who claims that it had been derived from his testator in his lifetime, or had been abstracted from his estate since his death, in some manner that did not divest his right to it. The case then, shown by the discovery, was not of either class to which the authority of the Probate Court to make the order of delivery, extended; and, therefore, the court erred in making that order.

The judgment of the Circuit Court must be reversed, and the cause remanded to that court, with instructions to reverse the judgment of the Probate, and enter up and certify to that court such a judgment as ought to have been entered up there. (*Dig.*, *ch.* 4 *sec.* 181, 182.